Defense Council, Inc., Center for Biological Diversity, Animal Welfare Institute v. Wilbur L. Ross, and his official staff, Secretary of Commerce, et al. This is case number 2018-2325. Councilman McCarthy. Good afternoon, Your Honor. Good afternoon. Patricia McCarthy. You're reserving two minutes of your time for rebuttal, correct? Yes, Your Honor. Okay. Okay, we're ready. Thank you, Your Honor. The child court's injunction should be vacated for a variety of reasons. First and foremost, as we noted on page 3 of our reply brief, the underlying action has been moot since November 27, 2018. The agency has issued, this is a 706-1 claim, the agency issued a final and conclusive determination. All of the documents we received with regard to the mootness issue were directed to the Court of International Trade, but we received no briefing directed to this court. Should that make a difference? It should not make a difference, Your Honor. I fully acknowledge it's awkward, and we would be delighted to provide supplemental briefing, but this issue is squarely before the Court. The Court of International Trade held oral arguments on our motion, which was fully briefed as of January. When this Court scheduled this case for oral argument, we immediately filed a Rule 28J letter advising the Court that this action, that our motion was still pending before the trial court. Shortly thereafter, the Court of International Trade scheduled oral arguments on our long-pending motion to dismiss and asked for supplemental briefing, which the parties provided, and we noted that in our second Rule 28J letter. Just unfortunately, from our perspective, last Friday evening, the Court of International Trade, after hearing oral argument and taking further supplemental briefing, the Court of International Trade declined to rule on the motion and stayed the underlying action. So, therefore, the question as to the jurisdiction of the trial court, particularly the first issue that arises is because we maintain, and we haven't been told that we're wrong, that the trial court lacks jurisdiction, we are essentially asking, Your Honors, for an advisory opinion as to the merits of this. A lot has obviously happened since last summer when Judge Katzmann entered his preliminary injunction. Frankly, as I view it, and I'm viewing it as a spectator rather than a participant because none of this is really part of our record, but as I see it, the complexion of the case is completely different because you now have a decision on the comparability issues. There are a lot of questions in my mind as to how all of that fits in, if at all, with the issue that's before us, which is the preliminary injunction predicated on the failure to take action at the time. Now, I have a bunch of questions, and I want you to answer some of them, but my first question is, why isn't all of this something that has to be decided initially by the trial court since there are numerous legal and factual issues that are raised by the new developments in this case? Well, we asked the trial court to decide. But if the trial court knew that we had jurisdiction over the case and decided to wait for us, we can invite the trial court to go ahead and decide those questions by sending it back to them. Why shouldn't we do that? Yes, in the ordinary case, the trial court would have been divested of jurisdiction, but we weren't asking the trial court for any specific relief regarding the injunction on appeal. We were asking because the threshold Article III case and controversy requirement has no longer been satisfied. This case is moot. This is a 706-1 claim. That decision requires factual findings. Well, there's a federal register notice that's a matter of public record in which the agency's final and conclusive determination regarding comparability findings. Mexico asked for comparability findings under the binding regulations, which the trial court, by the way, did not regard as binding in its original decision issuing the declaratory injunction. It didn't even apply the regulations, even though the regulations have been in effect since 2017. Mexico asked for comparability findings. The agency provided those. That is precisely why we… I understand you're excited. Okay. The Young Declaration, it actually talks about, and this is not something that's in front of us, but I know that y'all gave us links to all sorts of materials. The Young Declaration, I mean, could you give us some background here? You're talking about a final agency determination, but the Young Declaration, which I believe Ms. Young is with the government, she explains that on November 27, 2018, there was a memorandum issued by the government on comparability findings. But then just three days later, there was a change in administration in Mexico. And then subsequent to that change in administration, I understand that none of the actual regulations that had been discussed or that Mexico had originally proffered had been put into effect. So it makes me, again, go back to Adriana's point that isn't this a factual issue? I mean, you say there's a final agency determination, but your own declaration from Ms. Young says that there needs to be a comparability finding still on the basis that the government of Mexico has failed to put in place a regulatory comparable and effectiveness to the U.S. regulatory program. And I'm reading from paragraph 20 of Ms. Young's declaration. Yes, Your Honor. It was the final and conclusive agency action. It was published in the Federal Register. The agency is placing its own import ban on one Caribbean fishery in Mexico. That is a final and conclusive agency determination. Who is imposing an import ban? Well, the agency is the only authorized entity under the statute to do it, the Court of National Trade. Our view is that the Court of National Trade's injunction is ulterior. You're talking about the Department of Commerce? No. Okay. The National Marine Fisheries. Isn't that under the Department of Commerce? It's under the Department of Commerce, Your Honor. And so the Federal Register notice is 83-62844. I don't have my glasses. That indicates that the agency's final conclusion is final. How does that address, though, the remedy that the plaintiffs are seeking? They're seeking the import ban under the Marine Mammals Act. I mean, that's pretty specific. And yet what the subsequent action that has occurred doesn't really address that, does it? No, it's precisely the action under the Marine Mammals Protection Act. It doesn't address the issue of an import ban. All it does is say let's continue doing basically what we've been doing in the past. No, Your Honor, I respectfully disagree. The Federal Register notice makes it very clear, as does the agency's final determination, that it has made a determination as to whether U.S. standards are being violated as to certain fisheries that Mexico has interviewed. And Santa Clara Corvina has been banned, is that how you take it? Yes, yes. And the only reason why the agency's determination, which was made six months ago, the only reason why the agency's determination has not been put into place is because the trial court's ultra-variable injunction is blocking that. Okay. Something you said raises a question that I had about where we are in terms of the statutory language U.S. standards. Is it the government's position that the comparability determination is a determination that U.S. standards have been met or not met? Yes, that's exactly what it is. That's it, right? And it's using the regulatory definition of U.S. standards, which is in the regulations. But you say that's the agency's construction of the statutory language. Right. And the agency's entitled to deference. And we cited Wheatland 2 in our opening brief, and the appellees never responded to it. Wheatland 2 – Okay, I understand that. I have another question. So at the very end of the Federal Register for December 6th, there is a statement that the government in Mexico has requested that NMFS update its loft to reflect only those fisheries and gear types authorized to fish in the upper Gulf of California. And the agency then removes all gillnet fisheries listed as operating in the upper Gulf from the list of foreign fisheries. What is that all about? I tried to understand that in the context of export and exempt fisheries, and it didn't make any sense to me. Can you explain what that paragraph is all about? Yes, Your Honor. I will try to do this. The loft, I thought, was all foreign fisheries. It's all legal authorized foreign fisheries. Right. And the gillnet fisheries that Mexico asked the agency to remove are illegal. Okay. Illegal gillnet fisheries. And the main source, the main point of departure between the agency, which is lawfully defined, what U.S. standards means, and what the trial court is, is the trial court has been very explicit in holding that – So there's export, and there's exempt, and there's the illegal. And the export and the exempt are on the loft, and the illegal are left off the loft. And if they're left off the loft, then they're banned. Yes, they're banned under Mexican law. Mexico has banned – They're banned under U.S. law as well, I take it. Yes, they're banned under U.S. law, and they're banned under Mexico law. And let me just – This is not an import ban. The fact is – They're not allowed to – yes. And as Ms. Young, in the declaration to which Judge Stoll is referring, Ms. Young explained that under a different statutory authority, the Magnuson-Stevens Act, just as of January 1st of this year, the agency has implemented a brand new tracking system in order to trace – But come back to Dr. Rainey's question, because I have exactly the same question. The ban – this is a ban on importation? Is that what you're saying? Under the MMPA. For the fisheries that are – the Santa Clara and also all of the ones that have been taken off the loft, the importation of fish from those fisheries is banned by the U.S. Is that correct? Under different statutory authorities. Under the MMPA, under the agency's final determination in November, there will be a ban on the Caribbean fishery identified. And in terms of implementing that ban, as it's doing now, the agency will be putting – will be requiring certificates of admissibility for any – not only for China, not only for the Caribbean, but also for the China and for the Sierra, because they're intermingled under the Harmonized Tariff Schedule codes that Customs has. So are the fish that are coming from the illegal fisheries, setting aside the injunction that's in place, if the injunction were not in place, would those fish now be importable legally by the U.S.? And the reason would be, what action was it that rendered those not importable? Because under Mexican law, they're not allowed to – Never mind Mexican law. Under U.S. law. They'd be illegal under the Magnuson-Stevens Act. But I thought you said that something was going to be implemented. As part of enforcing – the appellee's real complaint is about the lack of enforcement of U.S. law. Under the Magnuson-Stevens Act, there's been a new SIMPA program, which Ms. Young describes in her declaration. It just went into effect January 1st of this year, and it provides for tracking and certification of all imports to assure that they won't be – But all of that does not go to an import ban. That's described under the statute. This is not an import ban we're talking about. No, it's because it's not covered. You're arguing that if a certain type of fishing is illegal in Mexico, then we can expect that those type of fish won't appear in the U.S. market. But the record reflects otherwise. The record reflects – I'm sorry. The record does not, Your Honor. I'm sorry to interrupt, Your Honor. But the record shows – the Marine Mammal Protection Act applies to legal fisheries, legal, authorized, licensed vessel registries. A ban – but let's get this squared away. An import ban would apply whether fishing in that country is legal or not, correct? No, Your Honor. MMPA – yes, under different statutory authorities. Under the MMPA, which is what this suit is about, only legal fisheries are regulated. It's akin to saying that the Food and Drug Administration regulates street heroin. It doesn't do that. You're talking about regulation in Mexico. The import ban is regulation at the border. No, Your Honor. There are different – the Madison-Stevens Act is a United States statute. The Lacey Act is a United States statute. There are Mexican – there are also Mexican laws, which also ban the exportation. And all gillnet fishery, except for the exempted fisheries in Mexico, are banned. And what's precedent is – Under Mexican law. Under Mexican law. But also you're saying U.S. law. And U.S. law as well, yes. There's a large – To get this – I mean, we're getting a barrage of different statutes. To cut it down to the basics, if we have fish that are coming either from the Santa Clara fishery – that's banned, no importation under the MMPA. If we have fish from the Gulf of California or anywhere else that are on – not on the loft, but are illegally caught, then they're banned. Although not under the MMPA, but under a different statute. And they can't be imported under U.S. law to the U.S. Is that – that's what you're telling us, right? Yes. Take, for instance, the illegal – Wait, wait, wait. Yes, yes. Make sure that I'm – what I'm saying is right. Yes, you're absolutely stated it 100% correctly, Your Honor. Okay, fine. Yes. And I'll just give you an example. The illegal Tswaba fishery, which is the main cause of the tragic loss of the vaquita, is if someone attempts to export a swim bladder into the United States, which has happened, then that – seven individuals were prosecuted for criminal violations by the U.S. Attorney's Office. Because that's wildlife trafficking, and that's smuggling. The Marine Mammal Protection Act does not address wildlife trafficking. It does not address smuggling. It addresses the regulation of lawful – Can I ask you another question, which is I looked at the federal registration notice, and it said that comparability findings are valid for a limited period unless revoked. I'm wondering whether they've been revoked given Ms. Young's statement that I had asked you about earlier where she said that new comparability findings need to be made. No, they have not been revoked. We are now proceeding under – although the trial court held that the regulatory scheme did not apply, it does apply. Why haven't they been revoked? Because the agency isn't – as Young indicated, the agency is in discussions with Mexico and making determinations and reconsidering. And it may take further action to augment its final action as of November. In fact, we received – on April 27th, we received – But the government of Mexico, as I understand it, has never implemented and is not currently implementing the regulations under which the U.S. gave them the comparability findings, right? The plan that Ms. Young described in her declaration has not been implemented to the United States' satisfaction. But this is an ongoing dialogue, and at some point, the discussions are continuing. The agency may reconsider its action and may amend those comparability findings. The comparability findings under the regulatory scheme, which again has the force of law and has been in place since 2017, even though the trial court said it did not apply, the comparability findings are all things being equal, so it's going to last for four years. In this case, the agency, pursuant to the regulatory scheme, may decide to take further action and actually may impose – it has the authority under the regulations to provide an import ban that is far more draconian than what the trial court has provided here. The difference is that that would be a lawful ban because the agency has the lawful statutory authority to do that, to implement and administer this regulation. And what the trial court has done instead has implemented an injunction that provides nothing but a disincentive to Mexico to take any of the QEDA protections. We don't know that, do we? I read that with interest, those comments that there's this disincentive. But we don't know that because there never has been this total import ban in place. Well, Your Honor, I'll tell you three things. First of all, I urge you to read the government of Mexico's amicus brief, which explains exactly the disincentive that it provided. And I also urge you to read Ms. Allen's declaration, which talks about the new change in administration. The circumstances for QEDA protections several months after the trial court's injunction has been in place has been to have civil unrest, has been to have – It seems to me that those documents say the following. We're taking action. We're going to take more action. Don't impose the import ban because we're trying. And even if you do import an import ban, it's not going to help because we can't prevent illegal fishing from going on in Mexico. And what I see here is that the only thing that has not been tested or done yet, after all these years of talk and talk, is the import ban. And we're looking at the PDR, the potential for biological reduction, and it seems to me it's becoming a PDR, a potential for biological redaction. There's just – I mean, isn't it time to move on to the step that hasn't been tried yet? There's no evidence in the record, Your Honor, that a licensed fishery has caused any vaquita bycatch in the past two or three years. There's simply no evidence in the record. The illegal fishing has been caused by – the vaquita bycatch has been caused primarily by illegal totoaba, which has absolutely nothing to do with the Marine Mammal Protection Act. And the definition of U.S. standards is in the regulation, and it is radically different from what the trial court applied. The trial court equated United States standards, an inherently ambiguous term, with PDR, and that is with all due respect to the trial court, a simplistic term, which is directly contrary to the regulations in the definition. You mentioned the amicus brief from Mexico. Given the state of the filing, am I correct in understanding that this amicus brief was actually filed by the previous administration? Yes, Your Honor. Thank you. That is correct. But we're not – you're not asking us to consider political questions, correct, shifting administrations and things of that nature? No, Your Honor, we are not. The one thing I will note that in terms of one of the most draconian and scary forms of relief that the trial court referenced the two footnotes in its decision, that it would contemplate doing a permanent injunction. It has no authority to do a permanent injunction. And imagine, if you will, if Your Honors take a look at the careful regulatory scheme that provides for a fluid interchange of data and a constant re-evaluation of whether standards are being met with a permanent, in perpetuity ban on for fisheries going forward, what possible incentive would the government of Mexico or any other – Why are we talking about that? There was no permanent injunction issued. Because the trial court has not dismissed the case as moot. That's the only thing left to provide. Well, other than the determination that the preliminary injunction should be vacated and the case is over. You're suggesting that the trial court is bound and determined to enter a permanent injunction. It seems to me that all these new facts may very well change the complexion of the case before the trial court. We hope that they do. Yeah. We believe that the trial – we have had oral argument more recently, and appellees can correct me if I'm wrong, but their position is that there's still more relief that they could receive, and that would be a permanent injunction. So it's your view that this is a case brought under 706-1, and that's all it could be brought under? There can't be any sort of conversion to a 706-2 case? No. In the most recent further supplemental filing at the trial court, the plaintiffs did ask for amendment of the complaint to allow them to bring a 706-2. And we fully recognize that, yes, the agency's final conclusive determination in November is subject to review under 706-2. But before that may occur, A, this unlawful preliminary injunction must be vacated. The 706-1 claim must be dismissed as moot, and we can go ahead and proceed. And we've committed to the trial court that we're the agency to do that. We would promptly file an administrative record. There could be judicial review. But we need to follow the APA here, and this is just not following the APA in any way, shape, or form. In response to one of Judge Stoll's questions a few minutes ago, I thought you said, but correct me if I'm wrong, that the comparability finding was predicated on an agreement that Mexico entered into with respect to what would happen going forward, not with respect to what was happening now on the ground or on the water. So this is just perspective. There's nothing, in other words, right now there's nothing in place that establishes that what's going on in Mexico in the fisheries that have been found to be comparable is in fact comparable to what's going on in the U.S. under U.S. standards. Is that a fair statement? Tell me if it's a fair statement first. Well, it's a fair statement, but let me be a little more specific. Is it a correct statement? The comparability findings were issued as to certain non-gillnet fisheries, and they were denied to the one gillnet fishery. Mexico has a general ban on gillnet fisheries, and it made exceptions for the Covina fishery. So in the November 27th determination, the agency said your non-gillnet fisheries are comparable, meaning U.S. standards. The gillnet fishery, the Covina gillnet fishery, that is an exception to the Mexico's ban, is not, and that's why the import ban is placed on that fishery. But there also was – it was based on the plan, right? I think it's referred to in the papers as the plan. But as I understand it, Mexico never implemented and has not yet complied with the plan. So that means that Judge Bryson's question, when he said that the basis for the agency's determination that Mexico has a plan and has – the comparability findings, excuse me, are not actually based on anything that's actually occurred. It's only based on something that's prospective. Yes, you're right. So that is your correct statement? Yes. And Mexico has been taking measures and committed to take further measures. And the agency's view currently, as Ms. Young has verified in her declaration, is that the agency – that Mexico, from the standpoint of the agency, appears not to be living up to its commitments, that there's been a change in administration and that the commitments are not being satisfied. And in your own papers, Ms. Young's declaration says that they are not – that they failed to comply with the plan. Right. And therefore, there is currently reconsideration of the comparability findings. And once the agency makes another determination consistent with the regulations, it may indeed pose – it could indeed. I don't think the statute allows you to have that time period. I mean, there's no compliance right now with the plan. So what in the statute allows there to be a negotiation before an import ban occurs? Well, in order to do an import ban, there needs to be a finding that lawful regulated fisheries are having the key to buy, catch, and access of U.S. standards. There's been no determination to that effect, and there's no evidence to that effect in the record. As we've explained, the trial court improperly applied. Even though it's undisputed that the MMPA applies to only lawful, licensed, regulated domestic fisheries, the trial court made this assumption defying the regulations and defying the definition of regulation. There's a likelihood of success, correct? I mean, the trial court already looked at the record and it has determined the likelihood of success, and that's one of the bases for the preliminary judgment. Let me go back to what Judge Stoll was saying. When would an import ban be imposed? At what point? The minute that this illegal injunction is dissolved, the import ban will go into effect the minute. It will be instantaneous. And that's just going to be on the Santa Clara fishery, correct? Yes, but in order to implement that, I want this to be very clear. In order to implement that, because of the HDS code, the import ban would require certificates of admissibility for Covina, Chano, and for Covina. Anything that would come into the United States... For which fish, again? You said Covina, Chano, and Covina. Which are the fish that you are... The ban is on the Covina, but where the import ban would go into effect would require certificates of admissibility, which is how they're being implemented right now. For all three fisheries, because of the way the harmonized tariff schedules are set... Are you talking about Covina? How about Covina, Sierra, Chano, and shrimp, as I understand it. Right, right. Now the injunction applies to those four fisheries. Shrimp would not be part of the import ban because there is no legal authorized gillnet fishery for shrimp. Shrimp, as I said, shrimp is illegal. Gillnet fishing is illegal, and there is simply no authorized... Does that cover the large percentage of fish that are caught in these waters that are exported to the U.S.? Yes. I see that I've run way over... You have. You run way over time. We let you, and you're responding to our questions, so I'll give you enough rebuttal. Thank you very much. Counselor Nguyen. May it please the Court. Vivian Wong for the Conservation Group. I'd like to start out by, I think, trying to address some misunderstandings of the record. Judge Bryson, you asked my opposing counsel whether the agency has made a decision on comparability, and that the case is thus moved. That is not the case, because defendants did take some action, but it is not the action that Congress commanded in that plaintiff's request, which is an import ban under the MMPA. Instead, they made comparability findings for seven non-gillnet fisheries that are not at issue in this case, issued a negative comparability finding for Carina from one port city, and then made no decision at all on the gillnet fisheries that we sued over, instead choosing to erase them from the list of foreign fisheries. But that converts them, as I understand it, into banned fisheries.  Is that true? No, Your Honor. We don't believe that that's an accurate reading of the record. Here we are. We have the fundamental disagreement between the two of you on a question that's just larded with factual issues. I mean, what are we to do with this? Now, we would say, well, we thought Ms. Wong was more persuasive, and therefore we believe her and not Ms. McCarthy. What in the world do you expect an appellate court to do with a dispute like this? Your Honor, I'm happy to answer questions and try to be helpful, but I also do agree with you that this is a fact-intensive. There are disputes of fact, for example, on exactly how the different regulatory regimes work, exactly what the agency did. Okay. Well, why don't you explain to me why it is that Ms. McCarthy has mischaracterized the consequence of taking those other fisheries off the law? Right. So she's referring to the agency's list of foreign fisheries, which is not a creature of statute but of the regulation. And what that is is sort of a reference tool for the agency where, by regulation, they classify fisheries as either exempt, meaning they have no more than a remote chance of killing marine mammals, or an export fishery, which means that they have more than a remote likelihood of incidentally killing a marine mammal in the case of commercial fishing. Now, Ms. McCarthy also refers to this as, refers to a third category of illegal fish, but that doesn't appear in the regulations. That's not part of the categorization. Her contention is that once a fishery is not in either the export or exempt category and is taken off the law, that it is illegal to import fish from those fisheries. Period. Not under the MMPA, but under U.S. law otherwise. Is she wrong about that? We do respectfully disagree, Your Honor. And I think part of the evidence of that is in the agency's own prior actions with respect to the list of foreign fisheries. Does the law prohibit the importation of those fish? That's not by the plain language of the law. The statute talks about an import ban, removal from the list of foreign fisheries. Whether or not that functionally operates as some other kind of prohibition is a fact-intensive question, Your Honor, that we think that the trial court ought to be able to resolve in the first instance. And Your Honor, if I may use an example to illustrate why the agency's position is not consistent. In 2017, the agency proposed a loss. And that included finfish gillnet fisheries, but did not list from Mexico the shrimp gillnet fishery. Now their final loss in 2017 included shrimp from Mexico. The Mexican government protested saying, hey, you know, these fisheries are illegal. We're not exporting them. And the agency said, well, no, we're still keeping that on the loss because we're retaining these as classified. Excuse me. The agency said we're retaining the supposedly illegal shrimp gillnet fisheries as classified as export and keeping it on the loss because of evidence of continued illegal fishing and vaquita mortality. And that's in the public record. That's at 83 Federal Register. Can I ask you something? So you're saying there's something that should have been taken off the list that they said that they were going to keep on the list, but that doesn't, and maybe I'm just confused, but that doesn't seem to me to demonstrate whether when something's on the loss list, that means that it can come into the country. And when it's not on the loss list, it means that it's banned. Right. Your honor is correct. Our position is that whether or not a fish, a fishery is on or off the list of foreign fisheries, which also by regulation, by their terms, doesn't even start until 2022. So that's not an immediate import ban, but even then. Whoa, whoa, whoa, whoa. You mean if something is off the loss, that it is not, there's not a ban until 2022. I thought being off the loft took you out from the MMPA and put you under the statutes that prohibit the imports from illegal fishers. We really shouldn't be having a discussion of these fundamental points where the parties are in disagreement. These have to be matters that are very clear. I just find it bewildering that we're sitting here discussing really basic things about the way this whole system works and we're getting different answers from both sides. I understand your honor. I think that part of the complexity here stems from the fact that we have complementary but non-duplicative statutory regimes. We have the Magnuson Act, the Lacey Act, and we have the Marine Mammal Protection Act. These all have different enforcement mechanisms. They target different things. And the Lacey Act, for instance, is looking at trafficking and at dealing with invasive species. The Magnuson Act deals with just fisheries, fishery stock health and fisheries management. The Marine Mammal Protection Act, which is at issue here, the priority of that is to ensure that marine mammals are not pushed away. Do the other acts have bearing on an import ban or not, whether an import ban is imposed or they even need one? If importations are prohibited under one of the other laws that you're talking about, then I don't think that helps you. Your honor, we think that there is still a need for a separate import ban under the MMPA. And, indeed, if Congress had intended for an MMPA regime to give way when Lacey or Magnuson regimes are in place, Congress could have specified that. So if the enforcement of the laws under the other acts, which at some point prohibit the importation, then doesn't that reduce the risk? Why do you need a preliminary injunction at that point? There's no immediate risk. I'm beginning to see something different here. If, in fact, these other acts had that type of an effect on the Marine Mammal Protection Act. Well, your honor, the injunction under the MMPA is still required because Congress chose this remedy knowing that the import ban itself, an embargo, which is something different from these other acts, different from wildlife trafficking penalties, for example, that embargo under the MMPA, what it does, it directly incentivizes foreign governments to change, to improve their practices in order to reenter a lucrative market. Are you saying, then, that the illegal fish are not embargoed? That illegally caught fish that are off the law are not subject to, they're not part of an embargo? Your honor, under the Marine Mammal Protection Act, there's not been, the agency has not made a finding that, you know, Mexico's protected regime is comparable, and thus there has not been an explicit or express ban under the MMPA. Well, they have been with respect to Santa Clara. Yes, your honor. And you're happy about that. So are you fully satisfied with respect to that fishery, that everything has been done that needs to be done? Yes and no, your honor. Yes, you're absolutely right. I apologize, it's complicated. See if you can make it as simple as you can, because so far I'm feeling underwater with respect to the complications. I will try, your honor. There's evidence on the record, including from defendants' own documents, that curvina gillnet fishing is occurring in various port cities and regions in the Vaquita's habitat, not just in the Gulf of Santa Clara. Their comparability finding is restricted to that, which means that their ban is restricted to that. And that means that because it's difficult to police which fish are coming over the border, the fact that a more comprehensive ban is likely to still give plaintiffs more relief, because otherwise it would be hard to tell. It's easier to tell there's no gillnet caught curvina at all, as well as this one from Santa Clara versus San Felipe. We think that a comprehensive ban is both what the statute requires and what the facts here compel, given the dire straits of the Vaquita. And, your honor, to return to your point about the loss, which I understand, I think there's a couple of points to make there. The first is that... I just want to ask you a question. Looking at the federal register notice on March 16, 2018, it says effective January 1, 2022, fish and fish products from fisheries identified by the assistant administrator in the loss can only be imported into the United States if the harvesting nation has applied for and received a comparability finding. So does this language effective January 1, 2022, is that the language you're relying on for your position that the loss doesn't even go into effect until then? Yes, your honor is correct that by the agency's own regulatory terms, the loss in that entire regulatory regime doesn't kick in until 2022. Did they change this at all? They did not, your honor. But I would say in addition to that, our argument does not turn solely on that. The loss itself regulates what's termed commercial fishing operations. And that does not distinguish between legal and illegal fisheries. And, in fact, part of what's contested on the merits of this case is whether it's permissible to interpret U.S. standards or the way this regulatory regime works as including only legal fisheries. And that is a question of the merits and not a question that goes to... Why is it your argument that it doesn't matter what's happening under all these statutes? What matters are that the numbers show that the vaquitas are diminishing in number. And that under the Marine Mammal Protection Act, there's a remedy for that. And that this remedy needs to be applied. And that remedy is an import ban. And that import ban, it seems to me, applies regardless of the other statutes, whether it's legal fishing, illegal fishing, or any type. It's an import ban. And that's what I thought we were looking at here. Yes, Your Honor, that is correct. Setting aside sort of the rest of this, we turn back to the language of the statute itself. And it does say that the agency shall ban imports when these fisheries are causing marine mammal death in excess of United States standards. And there's no measure of United States standards by which the vaquita, which is a population of which only approximately 15 individuals remain, which defendant's own evidence shows that gill net bycatch is their leading cause of mortality. And that even one more bycatch death threatens their very survival. There's no doubt that these fisheries are killing vaquita. In fact, the evidence shows that, or the numbers show, that a certain amount of vaquitas are killed every year or every two years. And if we go, stretch it out to 2022, we can pretty much say that by then, when other types of measures are implemented, that there may be just two or three. I mean, I just don't understand. I thought your argument was going to be different than what you're arguing today. Your Honor is correct that that is the core of our argument. I was trying to address issues more related to mootness and the actions that defendants recently took. Your Honor is absolutely correct. These standards are being exceeded. The Marine Mammal Protection Act is unambiguous in imposing a discreet and non-discretionary duty on the agency. Do you agree with the – well, go ahead. You had another point. I was just going to say that is the discreet, non-discretionary duty we seek to enforce. Do you agree that comparability findings is equivalent to U.S. standards as the government asserts? If I may answer in two parts, Your Honor. First, I think it's important to note that their definition of U.S. standards has shifted throughout the course of this discussion. I understand that, but they've settled on one now, and Ms. McCarthy is telling us that this is the current definition of U.S. standards. Now, do you think that that is – whether you look at it through the Chevron lens or just as a matter of statutory construction, is that correct in your view? I think it is correct but incomplete, Your Honor. The reason I would say that is if we look at even the regulatory text that she's pointing to. If we look at 50 CFR 216.24H, it says that to achieve a comparability finding and avoid a ban, a fishery has to show it does not exceed bycatch limit. Then if we go to 50 CFR 216.3, it defines bycatch limit as calculation of potential biological removal level for a particular marine mammal stock or comparable scientific metric. So either way we're getting at it, Your Honor, whether it's looking directly at potential biological removal, which is all over the statute itself, or if we're looking at, as they now take the position of litigation, the comparability findings. Even litigation, I think it's effectively in their more recent Federal Register notices. They're saying comparability equals U.S. standards as I read it. If the court were to record that weight, then we'd say that at the end of the day, we still get back to potential biological removal level. Right, but if they are saying, and it seems to me that's what I mean, if comparability equals U.S. standards and if U.S. standards, as you just said, is predicated on the PBR, then what they're saying when they find comparability is that the PBR is satisfied with respect to the fisheries that have been found to make comparability findings, right? And your only argument then would be, well, they're wrong about that. That's not correct, Your Honor, because their comparability findings are respect to seven non-gillnet fisheries that are not the fisheries we're suing over. I think that's the critical distinction. They keep on using the term comparability findings, but they're specific to these different fisheries at issue. And we sued over four specific gillnet fisheries. The comparability findings in that Federal Register notice pertain to seven non-gillnet fisheries that they concede are not at issue in this litigation, except for, as Your Honor has mentioned before, the Corvina fishery from Gulf of Santa Clara. And that is the only fishery or part of a fishery that is at issue in this case that they've actually made some sort of comparability to. So you're saying there's three other fisheries at least that are in your suit and the basis for your suit that do not have comparability findings at all? That's correct, Your Honor. They declined to make a finding one way or another. And they declined on the basis that they concluded that there was no legal gillnet fishing going on in those areas? No, Your Honor. What we're actually left with is... When you say no, Your Honor, do you mean no, I'm not correct, or that they didn't make a finding to that effect? I thought you were saying that they didn't address them at all, didn't even consider them. But am I misunderstanding you? Did they strike them from the law? They removed them from the law. So they did consider them to that extent? They did, but it's not the consideration, not the determination that's required by statute. And that's sort of what the issue here is. So are we down to trying to figure out if, contrary to what Ms. McCarthy is telling us, that the MMPA applies to illegal fishing? Is that kind of the crux of the question now? Because it sounds like that's where you're heading. Your argument is that these fisheries that use gillnets, but were not on the comparability determination, but rather taken off the loft, are nonetheless under the MMPA. Ms. McCarthy says that they don't belong under the MMPA because the MMPA only regulates legal fishing. They have to be dealt with under other statutory provisions. Is that the dispute, the core of the dispute that we're getting down to? I think that's fair to characterize that, Your Honor, because what is partly at issue here is indeed whether the MMPA applies to illegal fisheries. And that is a question of statutory interpretation. The trial court looked at and decided that the statute and the regulation itself doesn't make a distinction between illegal and legal, and so it applies to all of it. And that's a determination, again, that's a merits question. It does not go to whether this case is still a live controversy, or whether we can still obtain effective release from the court. And, Your Honor, again, to clarify your point that defendants, you say, have taken these three fisheries off the list, and that's equivalent action. What we are actually left with, actually, is only defendants' triple negative statement. No fisheries did not conclude that the PETA bycatch from Gilman fisheries that are not authorized do not meet U.S. standards. That's not the same thing as the finding that we request. It's not the same thing as the mandatory import ban that Congress commands. What portion of that brief were you just reading from? This is their reply brief, Your Honor, on the mootness question, which they would have referenced in their 28-J letters, but this is the brief before us. None of these issues, actually. These issues pertaining to the fisheries is not – these are questions that have all arisen after the close of the record on which this appeal is based on at first. And, second, any questions – these are questions of the merits that should go back to the trial court. These are questions that are fact-intensive, that in the first instance we respectfully say the court should be uncertain, should be considered by the Court of International Trade in the first instance. Okay, so where in the papers that were submitted to the trial court is the statement that you just read with the triple negative? I'll give you a moment if you don't mind. Sure. Actually, maybe if your colleague can find it, you can continue with your argument. That would be fine. Thank you. John, the standard for mootness is whether it is impossible for the court to grant any effective relief. And I think we are saying that an affirmative ban, pursuant to the MMPA on all four gillnet fisheries – Corvina, Chano, Sierra, and Shrimp – in the vaquitas range is still relief that this court can grant. This is not action that the agency has taken. If your honors have questions on sort of the factors because of the preliminary injunction appeal itself, I'm happy to address them, but I do see that I'm over time. I'm giving you all the time that you need and my colleagues need, so don't feel compelled to sit down. I do have a question that goes back to the question of where this fits under the APA. Is this, in your view, still a 706-1 case or is it more properly viewed as a 706-2 case? It's a former, Your Honor. It's a 706-1 case because we're trying to compel agency action that has yet to be taken. They argue that there is equivalent action, but that's not – Well, the southwest Utah case distinguishes between the two and says that, in effect, there's a big difference between – I'm not sure that this is a slight overstatement – but a big difference between not acting and refusing requested action. Yes, Your Honor. Now, why in this, in your view, haven't they done something which constitutes – they've responded to the issue you've raised and they've responded in a way that you think is unsatisfactory. Why doesn't that kick it out of 706-1? It's not that we find the response unsatisfactory. We don't even get there. We say that the response is not the one that's compelled by statute. Right, but isn't that exactly what every 706-2 plaintiff says, which is you did something which was not correct under the statute. That's what every APA review case since 1947, they've all been about that, or most of all. Our argument is not, at this stage of the case, is not that we disagree with the substance of the finding. It's that they haven't made a finding at all. All they've said is that, well, Mexico says we're not using these, we're not exporting, so we're just going to take these fisheries off the list of foreign fisheries. That's not the same thing as an actual comparability determination, which we know what a comparability determination looks like, right, because they made it for these seven non-violence fisheries, and they made a negative comparability finding for the Santa Clara Curvina fishery. They didn't issue any similar sort of final determination on comparability for the fisheries that are still at issue in our case. Can I ask you something? I was looking at the definition of export fishery in the regulation, and as part of that it says commercial fishing operations not specifically identified in the current list of foreign fisheries as either exempt or export fisheries are deemed to be export fisheries until the next list of foreign fisheries is published. So what does that mean? It sounds to me like it means that it doesn't matter whether it's on the list or not. Again, the list is a function of the agency regulation. We still think that it's disputed whether or not this thing is the same thing as an import ban directly versus just an administrative tool that is used for looking at tariff codes, for example. And, Your Honor, the way that list operates is that it doesn't by its own terms even kick in until 2022, and we cannot wait that long. If it is an import ban, which I have reservations about, then doesn't that render the import ban under the Marine Protection Act superfluous? Your Honor, I'm not sure if I understand. You're saying if the loss is itself an import ban, does it render the statutory? Import ban under the statute superfluous. If it were a straight import ban, then perhaps, but it's not clear at all from the regulations or even from the agency's own actions with respect to the list. To what extent is the imposition of an import ban under the MMA contingent on other findings by other agencies or the negotiations between Mexico and the United States and these other statutes that we're talking about? Can a finding be made for an import ban under the Marine Protection Act that doesn't even look at what the other enforcement proceedings are going on by other agencies or by the government of Mexico? Is it a standalone remedy? The import ban itself is, Your Honor, under the MMPA. Congress could have and has in other statutes allow for overlap. That's what confuses me about your argument because you're arguing all these other things, the comparability study, whether one is ready or not, where it seems to me the statute gives a standalone remedy for an import ban. That's right, Your Honor. We think that the trigger for that has been satisfied because the agency has, on its own record, determined that. An agency has standards in order to meet whether the import ban is required and part of it is the PBR, right? Right, whether the import ban is required is the trigger for that, Your Honor. The statute is whether there is marine mammal bycatch in excess of United States standards. And Your Honor is correct that United States standards includes potential biological removal level, which there's no dispute here that that level is being exceeded here. And that's a consistent factual position that the agency has not tried to back away from. And it's no exaggeration, Your Honor, to say that the vaquita is on the brink of extinction and as you were just saying, the statute makes the remedy in this case clear. The agency may prefer negotiations and may prefer these alternate regulatory measures and may seek to, as it says in its briefing, want to avoid market disruption. These may all be valid concerns. These are not concerns that Congress allows the agency to take into account because the command in the statute is clear. United States standards are being exceeded and an import ban under the MMPA is the remedy that Congress chose. Any questions? Okay, we thank you. Oh, Your Honor, I'm sorry. I have the page of the brief that you have. Yes, thank you. It is page four of their reprimand which is the district court document number 79. 79 is the number of page four. On page four? Yes. Do you have a particular spot that you're looking at or is it you just... Yes. If you don't mind. No, I have it. I just wanted to know what particular language you're pointing at. I apologize. The last paragraph on page four. Thank you. Right. So you reserve two minutes for both, Tom. Obviously, I'm going to give you more time. Thank you, Your Honor. You've been extremely indulgent. I appreciate it. First and foremost, it's been stated multiple times that the regulation is not in effect until 2022. Mexico asked for a comparability finding on November 9th, 2018. It waived the five-year exemption period. The regulation is in effect right now and it has been all along, but the five-year exemption period has been waived by the government of Mexico. The import ban will go into effect when and if this illegal injunction is ever dissolved. It will immediately go into effect in accordance with the Federal Register notice. What about that language, though, that I had read earlier about it says effective January 1st, 2022, fish and fish products from the fisheries identified by the Assistant Administrator in the loft can only be imported into the United States if the harvesting nation has applied for and received a comparability finding. You're saying something else. You're saying, trust me, trust me. We're going to do it right away. But I want to know, you know, I'm confused by this language. So please point to me where in the record I can find something to tell me that what I'm reading is wrong. The Federal Register notice, Mexico asked for comparability findings on November 9th. There's nothing in the Federal Register that says when a country asks for comparability findings, it's waiving the January 1st, 2022 date. Is there? I mean, that's what I'm asking for. I will find it in response to your question. Just to start with a threshold question about whether this statute applies to, covers illegal fishing. The import ban itself in the statute uses the word commercial fish, a fishing technology no fewer than three times. Commercial fishing. The statutory language refers to commercial fishing. It's fishing other than for your own purposes. Right. And that would be sued illegal as well as legal, you would think. Well, the regulation at 50 CFR 2016.3 defines commercial fishing operation means the lawful harvesting of fish for marine environment for profit as part of an ongoing... I think your argument on this is in the briefs. What I want to ask you is something different. If we were to disagree with you, or a court were to disagree with you, do you have an alternative argument? There was some suggestion earlier that maybe removing those fisheries from the loft list is enough to constitute agency action on those fisheries. But you're not arguing that, right? Your only argument is simply that the statute doesn't pertain to illegal fisheries. Right? We're saying that the statute does not pertain to illegal fisheries. Therefore, in accordance with the statute and the regulation, the agency removed at the behest of Mexico, which is consistent with Mexico's representation that these are illegal fisheries, removed them off the list of foreign fisheries because they are not covered within the ambit of the Marine Mammals Protection Act. And the way you get to that is because the agency has construed the word commercial to refer only to legal fishing? Right. There's nothing in the act itself that says commercial is limited to legal, right? This is a Chevron interpretation. Perhaps it's a Chevron, but it's a good Chevron argument. It's not in the statute, right? No. Well, I respectfully disagree a tiny bit, Your Honor, because the definition of... Is it in the statute or not? Well, for domestic fisheries, it is. At 16 U.S.C. 1387, the provision of the... This is for domestic fisheries, a list of domestic fisheries. The provisions of the section shall govern the incidental taking of remandals in the course of commercial fishing operations by persons using vessels of the United States or vessels which have valid fishing permits issued by the secretary in accordance with section 1824B of this title. But what about... No such title shows up in connection with the foreign commercial fisheries. No, but there is... But by reference to the U.S. standards, those are the reference... The U.S. standards refers to the domestic fisheries, which are licensed fisheries. The agency is instructed by Congress to compare apples and oranges, and you don't compare... You don't compare lawful domestic fisheries with illegal trafficking, illegal wildlife traffickers. There's no way that... That's because it's very difficult to do that. Well, and the agency... I will say that the agency has promulgated a definition which unambiguously applies that... Isn't that why an import ban is blind to whether a particular fish is legal or not, caught legally or illegally in a foreign country? Well, first of all, as I... And that's why the statute doesn't refer to foreign fisheries. The statute does refer to foreign fisheries, and the statute... The statute refers to legal... Really, the agency, whether rightly or wrongly under Chevron 2, has promulgated lawful regulations... With respect to the definition of commercial fishing... Which refers to lawful... There are other regulatory... Right, but that does not refer to foreign fishing. That's only a... That's a definition, or that applies to domestic fishing. The statutory language that I read, Your Honor, applies to domestic fisheries. Then there's the import ban. Then onto the regulations, which are lawful... Is there something similar with respect to foreign fishing? The only reference to foreign fisheries is the import ban, which uses the word commercial fishing operations not fewer than three times in the very import ban language. And so we think it's unreasonable... Would you say that any fish that is coming into the United States as an import is in the marketplace? I mean, the only reason why you would send a fish to the U.S. is to commercialize it. Your Honor, there's no dispute. There's... First of all, I misspoke a reason... Let me just address Your Honor's question. It's illegal to, under various schemes, including Mexico law and American law, including the Magnuson-Warren Act and the Magnuson-Stevens Act and the Lacey Act, it's illegal to import illegally caught fish. It's banned. It's banned under those statutory authorities. The MMPA provides an import ban for commercial fisheries because part of the intended beneficiary were the domestic fisheries, the American domestic fisheries. That was what Congress had intended. And... Okay, the other thing I wanted to do, Your Honor, Judge Stoll, I incorrectly responded to your question about the Mexican agreement has both current regulations and future commitments. So I didn't want to... I think I said that was all perspective. Are you going to answer my other question about the effective date? I apologize, Your Honor. The other thing I'd like to know is that... Are you going to answer my other question about the effective date? Okay. I'm sorry, Your Honor. I just wanted a yes or no. Yeah.  Yes. Thank you. I apologize, Your Honor. Okay. Thank you, Your Honor. The other thing is that the appellees themselves provided notice and comment on the statutory definition of U.S. standards. And this is part of the court's record because it was attached to our motion for emergency, the reply in support of our motion for emergency stay. Commentary on the regulations. Right. They provided notice and comment, and this is what the appellees themselves wrote in their notice and comment on this definition of U.S. standards, which is not, as the trial court held, the same as simply PBR. In their notice and comment, the appellees said, we commend... What page? This is the page. This is the docket entry of the Court 34.2 at page 9. Is it in our appendix? It's in the court's record. It's part of the emergency... It's a federal register notice? Sorry? I'm sorry. Go ahead. We don't have the trial court record. We have the appendix. It's in this court's record. We filed an emergency motion for stay. Oh, this court's record. This is the docket. This is the docket. This court's docket record. Number 34.2 at page 9. We filed this on November 2, 2018. And this was the appellee's own comment. We commend NMFS for proposing a comprehensive application of, quote, U.S. standards that includes in the italicized both a substantive by-catch standard in the italicized and procedural requirements that will allow NMFS to ensure nations are meeting the by-catch standard, including their requirements for stock assessments, vessel registry, which does not happen with illegal traffickers, and monitoring. 80 FedReg at 48.194. Congress clearly intended a broad interpretation of, quote, United States standards, under quote, because it did not identify a particular by-catch rate with which nations must comply, citing 16 U.S.C. 1371A2. And then it continues to go on. Accordingly, Congress clearly intended, quote, United States standards, under quote, to be broader than just a numeric by-catch standard and include a full regulatory program. And I ask your honors to compare that definition proposed and successfully achieved by the appellees themselves with the simplistic, with all due respect to the trial court, simplistic definition of United States standards applied at page JA35, among other places, with regard to the meeting of U.S. standards. This is a unquestionably ambiguous statutory term that the agency is fully empowered and entitled to define. It has defined it in regulations that have the force of law that have been in effect since 2017. And the one thing I will say about this five-year period, the impression given is that everyone, the harvesting nations, and the agency is just sitting around waiting for this five-year period to happen. The reason why there's a five-year period is because the agency is constantly interacting with the harvesting nations. They actually say here, I'm looking at this paper you just read to us. And it's talking about, I think their point here, though, is that they want to make sure there's procedural requirements that will make sure that whatever the definition is, that it has some, that there's some way for the agency to actually apply that and have impact. I don't know, there's a lot of different ways you can read it, but it says it's important that it have both a substantive bycatch standard and procedural requirements that will allow NMFS to ensure nations are meeting the bycatch standard. I'm not sure I read it in the way that you're reading it now. Well, in any event, they did not endorse what they're defending right now is a simplistic equation of United States standards with U.S. standards. And, Your Honor, the citation that you're looking for is 50 CFR 216.24-H8... Hang on, hang on, you're going a little fast. I'm sorry, I'm sorry, Your Honor. Could you please tell me what it is I should be looking for? I'm sorry, I'll do this a little slower. 50 CFR 2016.24-H8... Wait, wait, 15 CFR, I'm sorry, 50 CFR. I'm sorry, what is it? 50 CFR 216.24-H8 Roman numeral VI. And what does that say? It's the procedure. Let's see, Your Honor, if I can just pull it up here. I have that in front of me. It's the procedures for a comparability finding for new form commercial fishing operations. Where does that say that when it's going to go into effect? Mexico has been able to ask... I apologize, Your Honor, I don't have... There's just... The procedures for a new comparability finding, they allow a new foreign commercial fishing wishing to export to the United States, and these are the procedures that go into place. But there's nothing in the statute that prevents Mexico from... Mexico has asked for comparability findings in November 9th. They waived the findings... It's not clear from the regulations when those would go into effect. And so my question to you is, where does it tell me when those are going to go into effect? Because the language that I see talks about January 1st, 2022. The Federal Register notice says it's going to go into effect... Where? Where is that? This is all the 2016 regulation. August 15th, 2016. Well, if you can't find it, you can't find it. Well, let me offer a suggestion here. There is at... The regulation that I think you're talking about, which is the one that put 50 CFR 2... What is it? 216.24H into the regulations has a date on the first page of the Federal Register entry, which is 54.290. That is January 1, 2017. Is that... Do you think that's the right date? I guess... I see that this will remain valid until January 1, 2022. There's nothing that says that this won't go into immediate effect the way I'm reading the Federal Register notice. Did you... Are you looking at the same Federal Register notice that IM 50... 81 Fed Reg 54.390? I'm sorry. I'm looking at 83. I might explain this. I'm looking at 83 Fed Reg 62.844. The problem is that the one that's the date of March 16, 2018, which is the most recent one, has language. It's 83 FR 11703, has language that says effective January 1, 2022. And so even if something earlier says effective January 1, 2017, that doesn't address the concern that I'm having right now about this language in the March 16, 2018 Federal Register that refers to comparability findings being effective January 1, 2022. I'm sorry. I think I'm referring to the most recent Federal Register notice, which is the 83 FR 62.844, December 6, 2018. Are you referring to an earlier one? Okay. And, okay, I've got that in front of me. And that says valid for the period of November 30, 2018 through January 1, 2022. Yes. All right. I'm sorry. I'm very sorry for the miscommunication. Okay. I can do that. Thank you so much, Your Honor. You've been very indulgent. I want to give Ms. Swing the opportunity to address the argument about the plaintiff's commentary. And restrict yourself only to that issue. Yes, Your Honor. When you refer to plaintiff's commentary, you're referring to the… The comments you made in the proposed rulemaking. Sure. Your Honor, as Your Honor knows, this is a new argument that the government's making for the first time in a few years. That's why we gave you the opportunity to address it. Thank you, Your Honor. That statement is not at all inconsistent with the position that we're taking, that our comment letter stated that the United States standards includes potential biological removal. And it's just about part… The potential biological removal level is sort of the core around which the statute is based because it's looking at the current status of the population of the marine mammal species and what is threatening its existence and how much mortality, man-made mortality, it can tolerate. And our comment letter is not at all inconsistent with that position. It says U.S. standards include potential biological removal. All right. Thank you. Thank you, Your Honor. We thank the party for their arguments. This court is now recessed.